UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEBORAH ANN MAYEUX

VERSUS

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

CIVIL ACTION

NO. 16-755-EWD (Consent)

# RULING

Plaintiff, Deborah Ann Mayeux ("Plaintiff"), brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1] Plaintiff has filed a Memorandum in Support of Plaintiff's Appeal of the Commissioner's Denial of Social Security Benefits,[2] and the Commissioner has filed an Opposition Memorandum.[3] Based on the applicable standard of review under § 405(g) and the analysis which follows, the court **AFFIRMS**[4] the Commissioner's decision.

### I. Procedural History

Plaintiff filed an application for SSI on February 26, 2014 and an application for DIB on July 3, 2014 alleging disability beginning April 1, 2009.[5] Plaintiff's claim was initially denied on July 3, 2014.[6] Thereafter Plaintiff requested a hearing before an Administrative Law Judge

---

[1] *See*, AR pp. 167-172 (application for SSI); AR pp. 173-174 (application for DIB); AR pp. 1-4. References to documents filed in this case are designated by "(R. Doc. [docket entry number(s)] p. [page number(s)]." References to the record of administrative proceedings filed in this case are designated by "(AR [page number(s)])."

[2] R. Doc. 8.

[3] R. Doc. 10.

[4] The parties consented to proceed before the undersigned United States Magistrate Judge, R. Doc. 6, and on November 21, 2017 an Order of Reference was entered by the District Judge referring this matter "for all further proceedings and the entry of judgment in accordance with 28 USC 636(c)." R. Doc. 11.

[5] AR pp. 167-172; AR pp. 173-174.

[6] AR pp. 107-114.

1

("ALJ").[7] A hearing was held on April 21, 2015 at which Plaintiff, represented by counsel, testified.[8] A vocational expert ("VE"), Christy McAfree, also appeared and testified.[9]

On June 11, 2015, the ALJ issued a notice of unfavorable decision.[10] Thereafter, Plaintiff requested review by the Appeals Council.[11] On September 23, 2016, the Appeals Council denied Plaintiff's request for review.[12] On November 10, 2016, Plaintiff filed her Complaint.[13] Accordingly, Plaintiff exhausted her administrative remedies before timely filing this action for judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial review.[14]

## II. Standard of Review

Under 42 U.S.C. § 405(g), judicial review of a final decision of the Commissioner denying disability benefits is limited to two inquiries: (1) whether substantial evidence exists in the record as a whole to support the Commissioner's findings, and (2) whether the Commissioner's final decision applies the proper legal standards. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner fails to apply the correct legal standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054,

---

[7] AR pp. 120-125.

[8] AR pp. 16-61.

[9] AR pp. 55-60.

[10] AR pp. 90-101.

[11] AR p. 9.

[12] AR pp. 1-4.

[13] R. Doc. 1.

[14] *See*, 20 C.F.R. § 404.981 ("The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision. The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised. You may file an action in a Federal district court within 60 days after the date you receive notice of the Appeals Council's action.").

2

1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

### III. The ALJ's Decision

A claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1505; 416.905. The regulations require the ALJ to apply a five-step sequential evaluation to each claim for benefits. 20 C.F.R. §§ 404.1520; 416.920. In the five-step sequence used to evaluate claims the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe medically determinable impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in Appendix 1 of the regulations; (4) the impairment(s) prevents the claimant from performing past relevant work; and, (5) the impairment(s) prevents the claimant from doing any other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity ("RFC"), age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ made the following determinations:[15]

---

[15] AR pp. 95-101.

3

1. Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2013;

2. Plaintiff did not engage in substantial gainful activity since April 1, 2009, the alleged disability onset date;

3. Plaintiff had the following severe impairments: morbid obesity, status post panniculectomy,[16] lymphedema, Diabetes Mellitus, and neuropathy in the feet;

4. Plaintiff's fibromyalgia, pancreatitis, hypertension, and depression were "'non-severe' because they are no more than slight abnormalities having such a minimal effect on the claimant that they would not have been expected to interfere with her ability to work;"[17]

5. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment;

6. Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally climb ramps, stairs, ladders, ropes and scaffolds; frequently balance; and occasionally stoop, kneel, crouch and crawl. Additionally, she uses a cane to ambulate and balance;"[18] and

7. Plaintiff was "capable of performing past relevant work as an accounts clerk, mortgage accounts clerk, data entry clerk and front desk receptionist"[19] and therefore Plaintiff was not disabled within the meaning of the Social Security Act.[20]

### IV. Plaintiff's Allegations of Error

Plaintiff asserts five allegations of error. First, Plaintiff argues that the ALJ erred by failing to appropriately incorporate Plaintiff's use of a cane to ambulate and balance in the RFC. Second, Plaintiff complains that the ALJ's conclusion that Plaintiff's fibromyalgia was non-severe was not supported by substantial evidence. Third, Plaintiff asserts that the ALJ failed to follow social security rulings ("SSR") 02-1p and/or 00-3p when evaluating the impact of Plaintiff's obesity on her ability to work. Fourth, Plaintiff argues that the ALJ failed to follow SSR 16-3p when

---

[16] This is a surgical procedure that removes hanging fat and skin.

[17] AR p. 96.

[18] AR p. 97.

[19] AR p. 100.

[20] Because the ALJ found that Plaintiff was able to perform past relevant work, it was not necessary to proceed to the fifth and final step of the five step sequential analysis.

evaluating Plaintiff's subjective symptoms. Finally, Plaintiff asserts that the ALJ failed to resolve a conflict between a conclusion reached by the vocational expert and the ALJ's own conclusion that Plaintiff could perform her past relevant work.

V.     **Law and Analysis**

   **A. Substantial Evidence Supports the ALJ's Finding that Plaintiff's Fibromyalgia Was Non-Severe**

In his Decision, the ALJ found that Plaintiff's fibromyalgia was "non-severe."[21] Although the ALJ recognized that "[a] diagnosis of Fibromyalgia appears in the record...," he explained that the "record lacks any clear documentation of at least 11 of the 18 trigger points, and does not specify which, if any, trigger points generated positive responses, nor the amount of pressure applied, as is required under the regulations. (SS 12-2p). Besides, the claimant has not had any targeted treatment for Fibromyalgia, or any consistent treatment with a rheumatologist."[22] Based on the ALJ's Decision, the ALJ considered whether Plaintiff's fibromyalgia was a medically determinable impairment (a "MDI") and found, based both on SSR 12-2p and Plaintiff's treatment history, that Plaintiff's fibromyalgia was non-severe.

Pursuant to SSR 12-2p, fibromyalgia is a MDI "when it is established by appropriate medical evidence." 2012 WL 3104869. The Ruling clarifies that a "physician's diagnosis alone" is insufficient, and that "[t]he evidence must document that the physician reviewed the person's medical history and conducted a physical exam." *Id*. Under the Ruling, a claimant will be found to have a MDI of fibromyalgia when, in addition to a diagnosis, a physician provides evidence described in section II.A or II.B of the Ruling. *See also*, *Tebyanian v. Colvin*, Civil Action No. 14-1385, 2015 WL 4475762, at * 7 (N.D. Tex. July 22, 2015) ("Ruling 12-2p offers two tests for

---

[21] AR p. 96.

[22] AR p. 96.

determining whether a claimant's fibromyalgia qualifies as a medically determinable impairment."). Under either test, a claimant must show: (1) a history of widespread pain "in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) – that has persisted (or that persisted) for at least 3 months;" and (2) evidence that other disorders that could cause symptoms and signs were excluded.[23] In addition to these two requirements, under the first test, the claimant must also show at least 11 positive tender points during a physical exam.[24] Under the second test, a claimant instead must show "[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."[25]

Plaintiff argues that SSR 12-2p provides two independent bases for determining whether a claimant has a MDI of fibromyalgia, and that the ALJ erred in only considering the first approach for making this determination. Here, the ALJ's statement that "the record lacks any clear documentation of at least 11 of the 18 trigger points,"[26] indicates that the ALJ considered whether

---

[23] Per the Ruling, "it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)." Plaintiff has not pointed the court to any such tests.

[24] The tender points are located on each side of the body at the: (1) base of the skull; (2) back and side of the neck; (3) shoulder; (4) shoulder blade; (5) second rib; (6) outer aspect of elbow; (7) top of buttock; (8) below the hip; and (9) inner knee.

[25] The Ruling notes that certain "somatic symptoms" may be considered signs of fibromyalgia, and include "muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms." 2012 WL 3104869, at * 3, n. 9. Other co-occurring conditions noted in the Ruling are "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id*. at n. 10.

[26] Plaintiff does not assert that this statement by the ALJ is incorrect.

6

Plaintiff has a MDI of fibromyalgia using the first test set forth in the Ruling. Significantly, the Ruling does not require consideration of both tests, and Plaintiff has not directed the court to any jurisprudence holding that the failure to explicitly consider both methods of analysis under 12-2p constitutes reversible error.[27] Moreover, while Plaintiff argues that the ALJ should have considered "the second alternative approach" and addressed "the six or more fibromyalgia symptoms," Plaintiff does not specifically explain the "six or more FM symptoms, signs, or co-occurring conditions" she contends are supported by her medical records.[28]

"The burden of proving the existence of a medically determinable impairment, part of the analysis at the second step, is on the Plaintiff." *Rowe v. Colvin*, Civil Action No. 16-204, 2017 WL 3821473, at * 8 (M.D. La. Aug. 31, 2017) (citing *Laurent v. Astrue*, 366 Fed. Appx. 559, 561 (5th Cir. 2010) ("The claimant carries the burden of proof in the first four steps of the analysis.")); *see also*, *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("The claimant has the burden of proving she has a medically determinable physical or mental impairment lasting at least twelve

---

[27] Plaintiff also contends that "because the record is devoid of evidence appertaining to differential diagnosis and the systematic exclusion of alternative diagnoses, SSR 12-2p requires the ALJ to re-contact the doctors 'to resolve the insufficiency.'" R. Doc. 8, p. 9. "To determine whether the ALJ fully and fairly developed the record, we ask whether the record contained sufficient evidence for him to make an informed decision. So long as such evidence exists, the ALJ need not have supplemented the record with additional evidence." *Hernandez v. Astrue*, 269 Fed. Appx 511, 515 (5th Cir. 2008) (citing 20 C.F.R. § § 404.1516, 416.916; *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir.1996); *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989)). Here, because the court finds substantial evidence supported the ALJ's determination, it was not necessary for the ALJ to have supplemented the record. Further, "reversible error or an ALJ's failure to develop the record requires a showing of prejudice." *Ybarra v. Colvin*, No. 4:13-CV-3720, 2015 WL 222330, at * 8 (S.D. Tex. Jan. 14, 2015) (citing *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)). Here, Plaintiff has not explained how the ALJ's failure to re-contact Plaintiff's doctors was prejudicial and would have yielded a different result. *See*, *Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012) ("A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden.").

[28] Plaintiff asserts that the medical records evidence that Plaintiff "suffered from insomnia, depression, reduced energy levels, probable dysthymia, and generalized anxiety." R. Doc. 8, p. 8. Plaintiff cites the consultative examination by Dr. Michael Solomon, wherein Dr. Solomon diagnosed "diffuse musculoskeletal pain" and "depression." AR p. 250. Plaintiff also cites progress notes from Baton Rouge Clinic wherein Plaintiff complained of "fibromyalgia pain," decreased energy, and depression. AR pp. 269-270 & 371-374. It appears that Plaintiff had an initial evaluation with a rheumatologist on July 10, 2009, and at that time complained of diffuse pain and trouble sleeping well. AR p. 277 & 279. Assuming such records evidence depression, insomnia, and fatigue (signs or symptoms noted in SSR 12-2p), Plaintiff has not explained how such signs or symptoms were repeatedly manifested as required by the Ruling, nor how such evidence should be considered to be "six or more" symptoms, signs, or co-occurring conditions.

months that prevents her from engaging in substantial gainful activity."). Here, Plaintiff does not explain how she meets the requirements of a MDI of fibromyalgia under the second test set forth in 12-2p. Without first showing the existence of a medically determinable impairment of fibromyalgia, it is difficult to understand how Plaintiff could establish that fibromyalgia is a severe impairment in the first instance. *See*, *Rowe*, 2017 WL 3821473, at * 12 ("substantial evidence supports the ALJ's finding that lupus is not a medically determinable impairment, and therefore, not a severe impairment.").

Moreover, assuming *arguendo* that Plaintiff could establish the existence of a MDI of fibromyalgia, substantial evidence supports the ALJ's determination that Plaintiff's fibromyalgia is "non-severe." In the Fifth Circuit, an impairment is considered non-severe if it is "'a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (quoting *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)) (internal quotation omitted). "The burden rests on the Plaintiff at Step Two, but that burden is *de minimus*." *Rowe*, 2017 WL 3821473, at * 11 (citing *Calderwood v. Colvin*, Civil Action No. 14-495, 2016 WL 1077956, at * 9 (E.D. Tex. Mar. 18, 2016)). While the burden placed on Plaintiff is low, substantial evidence supports the ALJ's finding that despite a diagnosis of fibromyalgia, there is no indication that Plaintiff had any limitations stemming from that condition that would interfere with Plaintiff's ability to work. Although Plaintiff contends that the ALJ's finding that Plaintiff "has not had any targeted treatment for Fibromyalgia, or any consistent treatment with a rheumatologist" "is simply wrong and not supported by substantial evidence,"[29]

---

[29] R. Doc. 8, p. 9.

Plaintiff's medical records do not include consistent treatment with a rheumatologist.[30] Further, while Plaintiff argues that the ALJ erred in not recognizing Plaintiff's "repeated treatments with Cymbalta, a widely respected/acceptable treatment" for fibromyalgia,[31] Plaintiff's medical records do not include any limitations resulting from fibromyalgia and her medical records indicate that Plaintiff's complaints of pain were controlled via her medication.[32] *See*, *Parms v. Colvin*, Civil Action 14-330, 2015 WL 5176860, at * 5 (M.D. La. Sept. 3, 2015) ("the record shows that its resulting limitations occur rarely and are otherwise controlled by medication—Oxybutynin and Ditropan. Therefore, the ALJ's finding that Plaintiff's stress urinary incontinence was not a severe impairment at step 2 is supported by substantial evidence, as the medical evidence suggests this condition is well controlled by medication and is not limiting.") (citing *Sellers v. Barnhart*, Civil Action 00-1115, 246 F.Supp.2d 1201, 1211 (M.D. Al. Sept. 2, 2002) ("[S]everity ... must be measured in terms of its effect.... [S]ubstantial evidence supports the ALJ's conclusion that the plaintiff's [conditions] are not severe impairments despite the medications prescribed," where none of the medical records "indicate functional limitations" caused by the conditions)); *see also*, *Cagle v. Colvin*, Civil Action No. H-12-0296, 2013 WL 2105473, at * 5 (S.D. Tex. May 14, 2013) (explaining that although treatment records for depression and anxiety were found in claimant's record, "what is not in the record…is evidence that [claimant's] depression and anxiety have had any affect [sic] on her ability to perform basic work activities.").

---

[30] The record includes a July 10, 2009 initial evaluation with Dr. Bourg, a rheumatologist at Baton Rouge Clinic. AR pp. 277-279. There are not follow-up records evidencing continued treatment with Dr. Bourg. On September 8, 2014, Plaintiff presented and was admitted to Baton Rouge General for increased potassium on referral from a rheumatologist at Our Lady of the Lake, Dr. Harris. AR p. 1078. However, there is no indication that Plaintiff ever saw Dr. Harris (or any other rheumatologist at Our Lady of the Lake) outside of this reference.

[31] R. Doc. 8, p. 9.

[32] AR p. 272 (Baton Rouge Clinic progress note stating that Plaintiff complained of pain all over that was better with Cymbalta but not yet back to normal); AR 271 (Baton Rouge Clinic progress note stating Plaintiff complained of "mild fibromyalgia pain but Cymbalta and Lyric seem to help."); AR 546 (OLOL assessment and plan noted that fibromyalgia is "stable.").

9

## B. Substantial Evidence Supports the ALJ's RFC Determination

As noted above, the ALJ determined that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally climb ramps, stairs, ladders, ropes and scaffolds; frequently balance; and occasionally stoop, kneel, crouch and crawl. Additionally, she uses a cane to ambulate and balance;"[33] Plaintiff raises two issues with respect to this RFC. First, that the RFC does not adequately account for Plaintiff's use of a cane and second, that the RFC does not adequately account for Plaintiff's obesity.

### i. Plaintiff's Use of a Cane

Plaintiff argues that although the ALJ recognized Plaintiff's use of a cane to ambulate and balance, he did not "describe/explain how the use of the cane factor unto [sic] her functional limitations."[34] Plaintiff contends that her medical records establish the existence of her "lower extremity problems justifying continued use of a [sic] assistive walking device" and that the ALJ erred in failing to consider how Plaintiff's use of a cane could limit her ability to lift or carry items or balance.

During the April 21, 2015 hearing, Plaintiff testified that she does not walk without her cane because of balancing issues due to neuropathy in her toes.[35] Although she testified that she

---

[33] AR p. 97.

[34] R. Doc. 8, p. 6. *See also*, *id.* ("Whereas the ALJ does state the obvious – claimant uses a cane to ambulate and balance – he failed to discuss the difficulties associated with using the cane when occasionally having to stoop, kneel, crouch, crawl, climb ramps, stairs, ladders, scaffolds and ropes. And, he failed to discuss how cane use limits the claimant's ability to occasionally lift and/or carry items weighing up to 10 pounds. Further, he failed to consider that 'the occupational base for an individual who must use [an assistive] device for balance because of significant involvement of both lower extremities…may be significantly eroded.'"). Additionally, Plaintiff argues that the ALJ failed to distinguish between Plaintiff's balance problems on "narrow, slippery or erratically moving surfaces" versus level surfaces. *Id.* at pp. 6-7.

[35] AR p. 29 ("I don't walk without my cane because I'm – because of my neuropathy. I don't have the feeling in my toes. That's a balancing issue and I have to have my cane….").

had fallen "many times,"[36] she also testified that she had not fallen "since I've had my cane."[37] A review of Plaintiff's medical records includes treatment for only one fall,[38] and multiple records indicate that Plaintiff was able to ambulate with and without a cane.[39] Plaintiff testified that she is able to "run a load of clothes through the laundry," "pick up after" herself, and "put dishes in the dishwasher."[40] During the hearing, the ALJ asked the VE to summarize Plaintiff's past jobs and to explain the skills and exertional levels of each.[41] The ALJ then asked the VE the following hypothetical:

> Assume that the hypothetical individual is the claimant's age and education and the past work you just described; and further assume that this hypothetical individual could perform at the sedentary exertional level; can occasionally climb ramps and stairs; can occasionally climb ladders, ropes, and scaffolds; can frequently balance; can occasionally stoop, kneel, crouch, and crawl. Given that hypothetical, could such hypothetical individual perform any of the past work you just described as actually performed or generally performed in the national economy?[42]

---

[36] AR 30.

[37] AR p. 30. In response to further questioning regarding her history of falling, Plaintiff explained that "when I was heavier back in 2013, I fell. I can't even tell you how many times. Many times." AR p. 30. The ALJ then asked Plaintiff "[h]as this occurred recently at any point?" and Plaintiff replied "No, not recently, no. And like I said, I do have my cane…."

[38] AR pp. 406-407 (June 12, 2013 ENT follow up visit note wherein Plaintiff reported that she fell and struck her nose on June 1, 2013).

[39] *See*, AR p. 250 (July 15, 2010 consultative examination by Dr. Michael Solomon wherein Dr. Solomon noted Plaintiff was "able to walk into the room and walk out without any assistance or assistive device. She is able to get up on the exam table and down without difficulty."); AR p. 330 (June 28, 2011 note from Dr. Erika Flood indicating Plaintiff was ambulating normally); AR p. 326 (October 18, 2011 note from Dr. Erika Flood indicating Plaintiff was ambulating normally); AR p. 316 (July 20, 2012 note from Dr. Erika Flood indicating Plaintiff was ambulating normally); AR p. 312 (August 14, 2012 note from Dr. Erika Flood indicating Plaintiff was ambulating normally). Notes from the time period of October 2013 through January 2014 (*i.e.*, the time period leading up to Plaintiff's panniculectomy) indicate Plaintiff was experiencing greater difficulty ambulating and that while hospitalized used a walker. Following that procedure, Plaintiff completed an Adult Function Report on March 24, 2014 wherein she reported that she could walk for 30-40 feet before needing to rest for 5-10 minutes and that she used a cane for walking "especially outside." AR p. 218. *See also*, AR p. 1174 (October 16, 2014 initial evaluation at Lewy Physical Therapy noting that Plaintiff "currently uses a cane for mild balance issues.").

[40] AR p. 52.

[41] AR p. 57. The VE testified that was sedentary and either skilled or semiskilled. AR pp. 57-58.

[42] AR p. 58.

11

In response to that hypothetical, the VE testified that the hypothetical individual "could perform all of her past work…the accounting clerk, mortgage accounting clerk, the data entry clerk, and the front desk clerk."[43] The ALJ then added to that hypothetical that a cane was needed for ambulation and balance.[44] The VE testified that even with the addition to the hypothetical of needing a cane to ambulate and balance, the individual would be able to perform all of Plaintiff's past work. Ultimately, both these hypotheticals were reflected in the Plaintiff's RFC. Although Plaintiff's counsel asked the VE other follow up questions, he did not ask the VE to further modify the hypothetical to account for purported additional limitations caused by Plaintiff's use of a cane which Plaintiff now contends exist.

"Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." SSR 96-9p, 1996 WL 378185, at * 7.[45] Both the ALJ and the vocational expert understood that Plaintiff used a cane to ambulate and balance, and these limitations were included in the ALJ's residual functional capacity determination. Any additional limitations arising from the use of such cane are not supported by Plaintiff's medical records nor did Plaintiff's counsel raise same during the April 21, 2015 hearing. Accordingly, the undersigned finds that substantial evidence supports the ALJ's inclusion of Plaintiff's use of a cane to ambulate and

---

[43] AR p. 58.

[44] AR p. 58.

[45] The undersigned notes that although SSR 96-9p references unskilled sedentary work, the fact that Plaintiff's prior work was actually skilled or semiskilled expands the occupational based. SSR 96-9p, 1996 WL 374185, at * 4 ("The base may be broadened by the addition of specific skilled or semiskilled occupations that an individual with an RFC limited to sedentary work can perform by reason of his or her education or work experience.").

12

balance in Plaintiff's RFC, and that Plaintiff has not established that any additional limitations therefrom should have been considered. *See*, *Ybarra v. Colvin*, 4:13-CV-3720, 2015 WL 222330, at * 11 (S.D. Tex. Jan. 14, 2015) ("Ybarra argues that the ALJ failed to adequately address the impact of the use of a cane on Ybarra's work related activities. Specifically, Ybarra asserts that the ALJ failed to include any specific limitations in his RFC that would logically apply to an individual lifting and carrying objects while using with a cane. The Court disagrees. The ALJ's RFC expressly indicated that Ybarra must be able to use a cane for balance. Likewise, the ALJ's hypothetical question to VE Colenburg included the limitation that Ybarra be allowed to use a cane. Thus, any job matching this hypothetical profile necessarily incorporated the use of a cane."); *Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000) (finding ALJ was entitled to rely on testimony of vocational expert despite Plaintiff's claim that there was a conflict between that testimony and DOT descriptions of job requirements and explaining "[Plaintiff's] counsel was given an opportunity to object or cross-examine the vocational expert on the effect of Carey's amputation on his ability to perform the identified jobs….[Plaintiff] basically contends that the vocational expert's testimony that he could perform certain jobs requiring manual dexterity in the lowest third of the population should have been explored further, when [plaintiff] himself failed to do so in the administrative hearing.").

### ii. Plaintiff's obesity

Plaintiff also complains that "the ALJ failed to specifically consider the effects and analyze claimant's obesity in combination with her other impairment [sic] on her RFC and on her ability to work on a sustained basis."[46] The Fifth Circuit has explained that "Social Security rulings

---

[46] R. Doc. 8, p. 10. *See also*, *id*. ("the ALJ failed to specifically analyze the impact of claimant's obesity on her ability to work and made no mention whatsoever of her obesity in evaluating or determining her RFC.").

13

indicate that obesity—although itself not a listed impairment—can reduce an individual's occupational base for work activity in combination with other ailments." *Beck v. Barnhart*, 205 Fed. Appx. 207, 211 (5th Cir. 2006) (citing SSR 02–1p, 2002 WL 3468281 (stating that obesity remains a complicating factor for many ailments and is a "medically determinable impairment" to be considered in assessing an individual's RFC); SSR 96–8p, 1996 WL 374184; 64 F.R. 46122 (retracting obesity as a listed impairment under 20 C.F.R., Subpart P, Appendix 1)). *See also*, *Douglas v. Astrue*, Civil Action No. 11-126, 2013 WL 351355, at * 5, n. 17 (M.D. La. Jan. 29, 2013) ("Effective October 25, 1999, obesity was deleted as a listed impairment. However, the Social Security regulations require that obesity and its effects be considered in determining whether a claimant meets the listings related to the musculoskeletal, respiratory and cardiovascular systems, and considered in combination with other impairments throughout the sequential disability analysis.") (internal citations omitted).

Plaintiff complains that the ALJ "failed to specifically analyze the impact of claimant's obesity on her ability to work and made no mention whatsoever of her obesity in evaluating or determining her RFC."[47] However, the ALJ found Plaintiff's morbid obesity to be a severe impairment, and limited Plaintiff's RFC to sedentary work. In his ruling, the ALJ discussed Plaintiff's hospitalizations "for various complications primarily dealing with complaints of morbid obesity"[48] and ultimately found that Plaintiff had the RFC to perform past relevant work as an accounts clerk, mortgage accounts clerk, data entry clerk and front desk receptionist – jobs "at a sedentary level of exertion."[49] Plaintiff has failed to identify any evidence to support a finding that her obesity actually resulted in limitations precluding sedentary work. *See*, *Stovall v. Astrue*,

---

[47] R. Doc. 8, p. 10.

[48] AR p. 98.

[49] AR p. 101.

14

No. 4:10-CV-180, 2011 WL 2413323, at * 11 (N.D. Tex. April 4, 2011) ("Stovall has failed to identify any evidence beyond his own speculation that indicates his diabetes or obesity limited his ability to perform sedentary work and there is no objective evidence that any decreased functioning was attributable to such impairments.") (citing, *inter alia*, *Crossley v. Astrue*, No. 3:07–CV–0834–M, 2008 WL 5136961, at *5 (N.D. Tex. Dec. 5, 2008) ("Obesity is not a per se disabling impairment and Plaintiff has offered no medical evidence that her obesity actually results in these limitations or any further limitations beyond the sedentary work level found by the ALJ."); *Medrano v. Astrue*, No. 09-CA-584-SS, 2010 WL 2522202 at * 6 (W.D. Tex. June 17, 2010) (explaining that while the Social Security Rulings state that obesity can cause additional functional limitations, it "does not state obesity necessarily causes any additional function limitations" and finding there was no prejudice to claimant where ALJ listed obesity as a severe impairment and took it into account when limiting claimant's RFC to sedentary work); *Batton v. Astrue*, No. 11-632, 2013 WL 530594, at * 3, n. 5 (M.D. La. Feb. 11, 2013) ("Under SSR 02–01p, no specific weight or BMI necessarily equates to a severe impairment or limitation of function, and here the ALJ found that morbid obesity was one of the plaintiff's severe impairments, resulting in a restriction to sedentary work. Therefore, to the extent there was any error, it was a harmless error.").[50]

---

[50] Additionally, Plaintiff argues that the ALJ erred because he "failed to consider whether claimant's obesity equals or in [sic] medically equivalent to a listed impairment." R. Doc. 8, p. 11. Plaintiff has the burden of establishing that she meets a Listing. *See*, *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); 20 C.F.R. § 404.1520(d). The criteria for the Listings are "demanding and stringent." *Siewert v. Colvin*, Civil Action No. 15-476, 2016 WL 7478968, at * 6 (M.D. La. Dec. 29, 2016) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). "Plaintiff's subjective complaints, without objective medical evidence, are insufficient to establish disability." *Id.* (citing 20 C.F.R. §§ 404.1508, 404.1528, 404.1529). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Plaintiff argues that obesity may be medically equivalent to a listed impairment where obesity is of such a level that it results in the inability to ambulate effectively. R. Doc. 8, p. 11 (citing SSR 02-1p, 2002 WL 34686281). Plaintiff recognizes that "ineffective ambulation" is defined as "having insufficient lower extremity function to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." R. Doc. 8, p. 11 (emphasis added). *See also*, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(2) ("examples of ineffective ambulation include, but are not

### C. The ALJ Was Not Required to Apply SSR 16-3p

Plaintiff also contends that the ALJ committed reversible error because he failed to follow SSR 16-3p when evaluating Plaintiff's subjective symptoms. Plaintiff contends that "[c]ontrary to the requirements of SSR 16-3p, the ALJ did not dispense with the use of the term credibility and did not utilize the list of factors set forth in SSR 16-3p to evaluate claimant's symptoms beyond mere comparison to 'objective medical evidence.'"[51] Plaintiff argues that "the ALJ violated the requirements set forth in this important and recent Ruling, notwithstanding the fact that this Ruling became effective prior to the date of the ALJ's decision."[52]

First, the ALJ issued his decision on June 11, 2015. Per SSR 16-3p, adjudicators are required to apply 16-3p to determinations and decisions "*on or after March 28, 2016*." 2017 WL 5180304 (emphasis added). Moreover, while Plaintiff complains that the ALJ failed to consider her testimony regarding the need to elevate her legs, her "numerous hospitalizations over a 2-3 year period," and her use of a cane in violation of SSR 16-3p,[53] a review of the ALJ's decision shows that he did consider these issues. As discussed herein, the ALJ's RFC determination *did* include Plaintiff's use of a cane. With respect to Plaintiff's need to elevate her legs, Plaintiff's medical records do not include any recommendation to elevate her legs, or even self-reported notes indicating that Plaintiff reported to anyone (other than during her testimony before the ALJ) that such elevation was necessary. Finally, although Plaintiff's medical records do include a four month period between October 2013 and January 2014 of significant hospitalizations, it appears that those hospitalizations stemmed from complications due to Plaintiff's weight which culminated

---

limited to, the inability to walk without the use of a walker, two crutches or two canes…."). Here, it is uncontested that Plaintiff ambulates with the assistance of one cane.

[51] R. Doc. 8, p. 12.

[52] R. Doc. 8, p. 12.

[53] R. Doc. 8, p. 13.

in a panniculectomy. Following that surgery in January, 2014, Plaintiff's medical records indicate she was able to ambulate with a cane and responded well to physical therapy.[54] Finally, the undersigned notes that an ALJ's determination regarding the disabling nature of a claimant's pain is entitled to considerable deference. *See*, *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). "The determination whether an applicant is able to work despite some pain is within the province of the administrative agency and should be upheld if supported by substantial evidence." *Id*. "Moreover, pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment to be disabling." *Id*. Plaintiff's medical records provide substantial evidence that her pain is not disabling, and instead can be controlled with medication and/or therapy.[55]

### D. There Was No Conflict Between the Conclusion Reached by the Vocational Expert and the ALJ

Finally, Plaintiff asserts that "the ALJ 'recognized' the fact that claimant 'would miss two days of work per month,'" and the vocational expert testified that a hypothetical person who missed two days of work a month would not be able to sustain employment. Plaintiff contends that "[t]his response should have ended all further inquiries and claimant should have been declared disabled because of the absence of jobs for persons like herself, who is expected to miss at least two days per month due to her impairments."[56]

---

[54] AR pp. 770, 1174-1175, 1183.

[55] *See*, AR p. 100 (ALJ's explanation that medical records did not support degree of limitation alleged by Plaintiff regarding pain and need to elevate her legs). *See also*, AR p. 272 (May 26, 2009 Baton Rouge Clinic note indicating Plaintiff's pain better with Cymbalta), AR p. 271 (October 1, 2010 Baton Rouge Clinic note stating "mild fibromyalgia pain but Cymbalta and Lyrica seem to help."); AR p. 355 (Baton Rouge Rehabilitation note stating "pain is 1 or 2 out of 10 before and after treatment."); AR 496 (November 1, 2013 progress note stating pain 2 on a 1-10 scale after therapy); AR 500 (November 5, 2013 physician progress note stating pain in bilateral lower extremities mild and controlled with prescription medication); AR 1183 (November 4, 2014 physical therapy note stating "pt reports she has days where she is hurting so bad she can barely get up, but she has noticed that coming to the pool has really helped her so she is going to make herself come on the days she is hurting.").

[56] R. Doc. 8, p. 16. *See also*, R. Doc. 8, p. 17 ("the ALJ's ultimate determination that claimant is not disabled because she is able to return to her past relevant work conflicts with the expert opinion offered by the vocation [sic] expert, who opined that given the claimant's likelihood of missing two days per month due to her impairments, she could not return to her past relevant work <u>and</u> that there were no other jobs that could be available to her.").

"When hypothetical testimony by a vocational expert is unsupported by the evidence, the ALJ may properly disregard that testimony." *Jenkins v. Astrue*, 250 Fed. Appx. 645, 647 (5th Cir. 2007) (citing *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985)). During the April 21, 2015 hearing, the ALJ asked the vocational expert to modify the hypothetical[57] to consider an individual who would miss two days of work per month.[58] In response, the vocational expert testified that such individual could not perform the past work described.[59] Although Plaintiff correctly notes that the ALJ asked the hypothetical question, Plaintiff fails to recognize that the ALJ's RFC did *not* include such limitation. Accordingly, the ALJ found that a limitation of missing two days of work per month was not supported by Plaintiff's medical records. The undersigned finds substantial evidence supports this conclusion. Specifically, although Plaintiff's medical records do reflect significant hospitalizations from October 2013 through January 2014, following the January 2014 panniculectomy, Plaintiff's condition improved and she was no longer in and out of the hospital.[60]

## VI. Conclusion

The analysis above demonstrates that Plaintiff's claims of reversible error are without merit. The record considered as a whole supports the finding that the ALJ applied the proper legal standards and substantial evidence supports the determination that Plaintiff was not disabled. Accordingly, under sentence four of 42 U.S.C. § 405(g), the final decision of the Acting

---

[57] *See*, *supra* p. 11.

[58] AR p. 59.

[59] AR p. 59.

[60] Following the January 2014 panniculectomy, Plaintiff underwent an abdominal wound closure procedure on July 7, 2014 to heal a non-healing wound on the right side of the panniculectomy scar. AR 675. In September 2014, she was admitted to Baton Rouge General for a two-day period due to increased potassium. AR pp. 1071-1072. The only notes following September 2014 reflect physical therapy (at which it was noted Plaintiff could ambulate with a cane and that therapy sessions "really helped"), AR pp. 1174-1175 & 1183, trigger finger surgery, AR pp. 1199-1214, and an April 7, 2015 visit to Baton Rouge Podiatric Clinic for an ulcer on her left second toe. AR p. 1217.

Commissioner of Social Security, Carolyn W. Colvin, denying the applications for disability insurance benefits and supplemental security income filed by plaintiff, Deborah Ann Mayeaux, is AFFIRMED and this action is DISMISSED.

Signed in Baton Rouge, Louisiana, on January 4, 2018.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**